Filed 2/29/16  P. v. Thomas CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RODERICK THOMAS,<br><br>        Defendant and Appellant. | A142916<br><br>(San Francisco City & County<br>Super. Ct. No. 13024835) |

Defendant was convicted of burglary and felony murder after a shooting during a home invasion.  The only significant evidence of defendant's activities before and during the break-in was his own statement to police, in which he claimed to have been forced to enter the home by two men who, he believed, were armed.  Defendant contends the trial court erred in refusing to instruct the jury on the defense of duress on the basis of this evidence and in excluding defense expert testimony regarding defendant's susceptibility to coercion.  We agree and reverse on this ground.

Defendant also contends his statements to police should have been suppressed because the police ignored his invocation of the right to counsel under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and coerced the statement through promises of benefit.  Because of the possibility of retrial, we also address these issues and find no error in the admission of defendant's statements.

# I.  BACKGROUND

Defendant and codefendant Marcellis Williams were charged in an information, filed November 13, 2013, with premeditated murder (Pen. Code,[1] § 187, subd. (a)), residential burglary (§ 459), and residential robbery (§ 211).  The information also alleged that a principal in the crime was armed with a firearm and the defendants were aware of this.  (§ 12022, subds. (a)(1), (d).)  Prior to trial, the robbery charge was dismissed against both defendants, and Williams pleaded guilty to lesser charges.

The crime occurred in the home of D'Andre White, who had known defendant since childhood; both lived in the Lakeview neighborhood of San Francisco.[2]  Defendant periodically purchased small quantities of marijuana from White and was a frequent visitor to his home.

On the evening of April 1, 2012, White was about to leave his house with friends when defendant appeared and asked to purchase marijuana.  White said he was on his way out and would call defendant later.  While White was away, defendant called him several times, at one point telling White he wanted to purchase two ounces of marijuana, a much larger quantity than defendant's typical purchases.  Eventually, White told defendant he would return home soon and asked defendant to meet him at his home.

When White and several friends arrived at the house, they entered together through the front door, which led into the upstairs portion of the house.  As White went into an upstairs bedroom, his friends walked downstairs.  White soon heard screams and gunshots, grabbed a handgun, and rushed downstairs.  White found one of his friends, Jahmad Karriem, lying on the floor of a downstairs bedroom, shot.  Karriem was holding a handgun.  There was a large hole in a door leading to the garage, which was also on the downstairs level.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] In this background section, we summarize certain of the evidence presented at trial.  Procedural details and other facts pertinent to defendant's legal arguments are presented in the discussion of the individual arguments.

One of White's friends who was present at the home that night, Elrey Cayetano, also testified. In contrast with White's testimony, Cayetano recalled that he arrived at the house a few minutes after White and Karriem. When he entered the house, Cayetano called to White, who told him to go downstairs. As he descended the stairs, Cayetano turned a corner at a landing, saw "the shadow of a gun" outside a door leading to the garage, and stopped. The person holding the gun pointed it at Cayetano said, "get with your nigga," and motioned with the gun toward the bedroom, located across from the door leading to the garage, in which Karriem was later found. Cayetano then heard a gun being cocked from within the bedroom. As the gunman pointed his gun toward the bedroom, Cayetano turned and ran upstairs. As he did so, he heard three or four gunshots. When Cayetano reached the top of the stairs, White met him, carrying his gun, and the two ran back down and found Karriem. Cayetano was unable to describe the gunman or identify his voice.

Karriem died as a result of multiple gunshot wounds. Later investigation found that the gunshots had been fired largely from the garage of White's home. One bullet casing was found in the bedroom, matching the caliber of the gun near Karriem's body. That gun appeared to have jammed. A trail of Karriem's blood was found leading from the bedroom to the garage; a police officer speculated the trail was created when Karriem, shot in the bedroom, pursued the gunman into the garage.

An investigating officer concluded only one shooter was present in the garage and, at some point, that person fired shots from a position in back of a car parked in the garage. Williams's fingerprints and palm prints were found on the car. Based on the pattern of prints, the officer concluded Williams had climbed over its roof. During that time, she assumed, Williams could not have fired a handgun. As a result, the officer concluded Williams was not the person who fired the shots in the garage.

The primary evidence of defendant's involvement in the burglary and shooting came from a police interview several months after the shooting. At the time, defendant

was in jail in San Mateo County.[3] After the detectives told defendant cell phone records placed him near White's home at the time of the shooting, defendant told them he went to White's house to purchase marijuana and ended up "in the middle of the robbery." Defendant explained that on the day of the shooting he had been stopped by two persons in a car whom he knew "from the neighborhood." He did not know their names, but he had heard them called "Smoke" and "Mace." Because the two knew he was acquainted with White, they asked him to call White and arrange to buy marijuana. The three were driven to White's house by a third unidentified person, where they found White had not yet arrived. One of the two other men then ordered defendant to open the garage door, which he did. After he opened the door, defendant told the detectives the two men made sure he went in first so he could not turn and run away. Defendant believed he could not "try to break [away] without them grabbing me."

Defendant did not realize the two men intended to steal from White until they entered the house despite White's absence. Defendant had no intention of stealing from White, but he entered with the other two because he was frightened. Although neither of the two had actually displayed a gun, defendant, who was unarmed, felt "sure they always got guns." One of them had made gestures suggesting he was armed, and defendant saw a bulge in that man's clothing consistent with a gun.

As they walked through White's house, the two men were "grab[bing]" things. One of them walked behind defendant, watching him, questioning him about the house, and ordering him to open drawers. Defendant wanted to leave and was trying to figure out a way to "escape," but he concluded "it was too late, I was already caught in the middle of the shit, . . . ain't too much running you can do when somebody got a gun." From two to five minutes after they entered the house, White arrived. Soon after, defendant heard one or more people coming down the stairs, and he saw Karriem. At that point, the shooting started. Defendant ran out the garage door and down the street.

---

[3] Defendant's interview with police occurred in two sessions. Initially, defendant was interviewed at the San Mateo County jail; later, with his consent, he was taken to a police station in San Francisco to examine photographs while continuing the interview.

4

Toward the end of the interview, defendant told the detectives the two men were actually known as "Tay" and "C-Mack." Defendant eventually identified a photograph of Williams as that of C-Mack. He said Tay, whom he did not otherwise identify, had the gun and was "controlling the situation."

The prosecution presented evidence of a prior uncharged robbery involving defendant. According to Robert Guevara, defendant approached him to purchase marijuana in August 2011. A few days later, defendant called Guevara and asked if he could buy some marijuana. Guevara agreed and gave defendant the address of a Daly City motel where Guevara was staying with his mother. Defendant came to the motel with another man, who was unknown to Guevara. Soon after entering Guevara's room, both men displayed guns. Defendant pointed his gun at Guevara's head, while the other man pointed his gun at Guevara's mother. They took Guevara's money and marijuana and left. During the robbery, defendant did not appear to be frightened of the other man. Guevara acknowledged during cross-examination that, when interviewed immediately after the robbery, he told police only the other man, not defendant, had a gun. He explained he had lied because he was frightened of retaliation by defendant.

Defendant was eventually arrested on the basis of Guevara's identification. When police interviewed defendant about the robbery, he admitted he was at the motel on the day of the robbery, saying "something to the effect of he was in the wrong place at the wrong time." Defendant told police his ex-girlfriend called him and said she and her friends wanted to purchase marijuana. When she came to pick defendant up, two men accompanied her, riding in a separate vehicle. Defendant entered that vehicle and was driven to the motel where Guevara was staying. Once inside the vehicle, one of the men showed defendant a gun. At that point, he realized what they intended to do, but he could not leave the moving vehicle. When they arrived at the motel, one of the men accompanied defendant to Guevara's room. Once inside, that man displayed a gun and robbed Guevara. Defendant left with the two men because he was too frightened to run away. Defendant could not identify the other two men, other than to provide their

5

nicknames. Based on these events, defendant later pleaded no contest to a charge of first degree residential burglary.

The jury found defendant guilty of burglary and first degree murder. Although the jury found true the allegation that a principal in the crime was armed with a firearm, it found not true the allegation that defendant was aware of the firearm. Defendant received a sentence of 25 years to life imprisonment.

## II. DISCUSSION

### A. *Instructional Error*

Defendant contends the trial court erred in failing to instruct the jury on the defenses of duress and necessity and the lesser included offenses of first degree murder. We review claims of instructional error de novo. (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1378.)

#### 1. Duress and Necessity

Defendant requested the trial court to instruct the jury on the defenses of duress and necessity, based on his police interview. The court declined, concluding, as to duress, there was no substantial evidence to support a finding defendant had a reasonable belief his life was in immediate danger. The court found that most of defendant's references to being frightened concerned his fear of retribution, rather than his fear at the time of the crime and noted that, although defendant believed the two men had guns, he never actually saw a gun. It also cited inconsistencies in defendant's statements that tended to undermine his assertions of concern. As to necessity, the court found, among other things, that defendant did not lack an alternative to the burglary, since he could have walked away prior to entering the garage.

A defendant is entitled to an instruction on any affirmative defense supported by substantial evidence in the trial record. (*People v. Salas* (2006) 37 Cal.4th 967, 982 (*Salas*).) "In deciding whether defendant was entitled to the instructions urged, we take the proffered evidence as true, 'regardless of whether it was of a character to inspire belief. [Citations.]' [Citation.] ' "Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused." [Citations.]' [Citation.] Even

6

so, the test is not whether *any* evidence is presented, no matter how weak. Instead, the jury must be instructed when there is evidence that 'deserve[s] consideration by the jury, i.e., "evidence from which a jury composed of reasonable [people] could have concluded" ' that the specific facts supporting the instruction existed." (*People v. Petznick* (2003) 114 Cal.App.4th 663, 677.)

"The defense of duress is available to defendants who commit crimes, except murder, 'under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused.' " (*People v. Wilson* (2005) 36 Cal.4th 309, 331 (*Wilson*).) "An essential component of this defense is that the defendant be faced with a direct or implied demand that he or she commit the charged crime." (*People v. Saavedra* (2007) 156 Cal.App.4th 561, 567.) "The duress defense, through its immediacy requirement, negates an element of the crime—the intent to commit the act. The defendant does not have the time to form criminal intent because of immediacy and imminency of the threatened harm and need only raise a reasonable doubt as to the existence or nonexistence of this fact." (*People v. Heath* (1989) 207 Cal.App.3d 892, 901 (*Heath*).) "Although 'duress is not a defense to any form of murder,' [citation] 'duress can, in effect, provide a defense to murder on a felony-murder theory by negating the underlying felony. [Citations.] If one is not guilty of the underlying felony due to duress, one cannot be guilty of felony murder based on that felony.' " (*Wilson,* at p. 331.)

" 'The defense of necessity generally recognizes that " 'the harm or evil sought to be avoided by [the defendant's] conduct is greater than that sought to be prevented by the law defining the offense charged.' " [Citation.] The defendant, who must have possessed a reasonable belief that his or her action was justified, bears the burden of proffering evidence of the existence of an emergency situation involving the imminence of greater harm that the illegal act seeks to prevent.' " (*People v. Trujeque* (2015) 61 Cal.4th 227, 273.) At common law, " '[w]hile the defense of duress covered the situation where the coercion had its source in the actions of other human beings, the defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils.' "

7

(*Heath, supra,* 207 Cal.App.3d at p. 899.)  "An important factor of the necessity defense involves the balancing of the harm to be avoided as opposed to the costs of the criminal conduct.  [Citation.]  Unlike duress, the threatened harm is in the immediate future, which contemplates the defendant having time to balance alternative courses of conduct.  [Citation.]  The defendant has the time, however limited, to form the general intent required for the crime, although under some outside pressure.  [Citation.]  Thus, the defense does not negate the intent element, and the defendant has the burden of proving the defense by a preponderance of the evidence." (*Id*. at p. 901.)

We agree with defendant that the trial court erred in failing to instruct on the defense of duress.  The essential elements of the defense are a (1) direct or implied demand by another to commit the crime and (2) an imminent threat sufficiently serious to cause the defendant to reasonably believe that his or her life would be endangered if the demand is refused.  Defendant told the detectives he was confident, based on the character of the two men, their conduct, and a telltale bulge in the clothing of one of them, that they were armed.  In opening the garage door and, once inside, otherwise assisting in the theft, he did so unwillingly at the direction of the two men.  While they did not threaten him orally, their conduct caused him to fear that, if he resisted, he would be shot.  This constitutes substantial evidence sufficient to support presenting the defense of duress to the jury.

In finding defendant, as a matter of law, could not have reasonably believed his life was in danger because the men did not actually show him a gun, the court was applying too high a standard.  All that was required was a reasonable *belief* in the threat of deadly force.  Based on his prior familiarity with the men, defendant knew them to be persons who were likely to be armed.  They made gestures consistent with the carrying of arms, and defendant saw a gun-like bulge in the clothing of one of them.  This was sufficient to create a reasonable *belief* of imminent deadly threat.  Of course, if a gun were actually displayed defendant would have had actual *knowledge* of a deadly threat, but a reasonable belief is all that the defense requires.  In parsing defendant's statement

8

for inconsistencies, the trial court was effectively weighing its credibility, a task better left to the jury.

We do not reach the same conclusion with respect to the defense of necessity. As explained above, necessity arises in a situation of non-imminent threat, when the accused has an opportunity to weigh his or her options. Necessity is therefore not appropriate in these circumstances, in which the threat was immediate.

While we conclude the trial court erred, we reverse a conviction only if the error was prejudicial. Instructional error is normally subject to the *Watson* test for prejudice (see *People v. Diaz* (2015) 60 Cal.4th 1176, 1195), which requires reversal if " 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*).) The Supreme Court, however, has expressly left unresolved the standard of prejudice applicable when the failure to instruct concerned an affirmative defense (*Salas, supra,* 37 Cal.4th at p. 984; *People v. Watt* (2014) 229 Cal.App.4th 1215, 1219), and it has applied both the "harmless beyond a reasonable doubt" standard of *Chapman v. California* (1967) 386 U.S. 18, and the *Watson* standard in these circumstances (*Chapman*, at p. 24; see *Salas*, at p. 984.) We need not resolve the issue because we find prejudice even under the stricter (from a defendant's point of view) standard of *Watson*.

As discussed above, the defense of duress governs the mitigating impact of coercion on criminal liability. Under the defense, coercion does not excuse the commission of a crime unless the defendant reasonably believed his or her life would have been put at risk by a refusal to comply with the demand of another to commit the crime. In declining to give the instruction, the trial court effectively declared defendant's claim of coercion irrelevant, since it held that, as a matter of law, the coercion claimed by defendant was insufficient to meet the legal standard of duress. Under the circumstances, the ruling was tantamount to directing a guilty verdict on the charge of burglary, since by defendant's own admission he broke into the home with the knowledge that in doing so he was aiding the other men who intended to steal from White.

9

Because of the confusion in the trial court's implementation of its ruling, however, we conclude the jury's guilty verdict cannot be relied upon as a guide to its evaluation of defendant's claim of coercion. In closing argument, the prosecution correctly contended that the court's ruling had rendered defendant's claim of coercion legally irrelevant. The court, however, sustained defense objections to this argument. In doing so, the court failed to clarify for the jury the proper legal standard to be used. Since the court did not deliver an instruction on duress, the instructions gave the jury no clear guidance regarding the legal significance of a claim of coercion. Further, the court permitted defense counsel to argue defendant should be acquitted if the jury concluded he acted against his will in entering the White residence. This was, of course, the equivalent of a duress defense, but it was asserted without satisfying the various elements of the formal defense of duress, notably the requirement of an objectively reasonable fear of a mortal threat.

The confusion was increased by the court's allowance of expert testimony on defendant's mental deficits. As discussed below, while the court allowed this testimony, it improperly limited the scope of the testimony by preventing the expert from testifying as to the effect of these deficits on defendant's susceptibility to coercion. The purpose of the testimony was therefore unclear, compounding any prejudice from the court's failure properly to instruct.

It was almost inevitable the jury would be confused by the mixed messages delivered by the court and counsel, and this confusion was confirmed in a jurors' note sent after several days of deliberation, in which the jury asked, "If the defendant opened the garage door knowing that it would assist the burglary, but he did not want the burglary to occur, would that constitute aiding & abetting?" Rather than resolve the jury's confusion by answering the question, the court merely referred the jurors back to the jury instructions, which did not directly address the issue. Given this confusion, it is impossible to know whether the jury's guilty verdict was based on a conclusion that defendant was not, in fact, coerced, or an acceptance of the prosecution's claim that

defendant's fear was irrelevant.[4] We therefore can draw no inferences from the jury's guilty verdict with respect to its view of defendant's claim of coercion.

For this reason, in applying the *Watson* standard we must evaluate the likelihood in the abstract of defendant's conviction, under proper instruction. What is striking about this case is the lack of evidence connecting defendant to the crime, outside of his own statements. The only other incriminating evidence was testimony that defendant was well-acquainted with White and his home, had been in contact with White that evening, and was in the general area at the time of the burglary. Other than his own account, nothing placed defendant inside White's home that night. The evaluation of prejudice therefore depends entirely on a judgment of the credibility of defendant's statements to police. As discussed above, those statements provided substantial evidence to support a defense of duress. Accordingly, if it is reasonably probable the jury could have believed defendant's account, the judgment must be reversed.

In making that determination, we start with the proposition that the determination of credibility is ordinarily for the jury. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1264, fn. 16.) Because it cannot be determined from the verdict whether the jury actually evaluated the credibility of defendant's account, the primacy of the jury's in evaluating credibility weighs heavily in favor of reversal. Defendant was entitled to a jury determination of his credibility. Unless there was strong objective evidence suggesting his account was untrue, a reversal is necessary. There is no such evidence. While defendant's story seems improbable, it is not inherently incredible. His use of a similar story to excuse a different crime certainly casts doubt on the truthfulness of his claim of coercion, but it is not conclusive. Further, the victim's original story to police in that case—that defendant was not armed—was consistent with defendant's claim of coercion.

---

[4] Had the jury followed the court's direction and studied the jury instructions, an acceptance of the prosecution's argument was more probable, since the instructions made no allowance for a claim of duress.

Our reversal of the judgment moots defendant's remaining claims of error. In the interests of judicial efficiency, we proceed to address issues that are likely to arise on remand.

## 2. Lesser Included Offenses of First Degree Murder

Defendant contends the trial court erred in failing to instruct the jury on the lesser included offenses of first degree murder.

During the jury instruction conference, defense counsel asked the trial court to instruct the jury on second degree murder, voluntary manslaughter, and involuntary manslaughter. The prosecution opposed the instructions, arguing its theory was felony murder exclusively and no evidence had been introduced to support either premeditated murder or any of the lesser included offenses of that crime. The trial court declined to give the instructions, concluding that because there was insufficient evidence to support a finding that defendant was the shooter, he could not be convicted of any of the lesser included offenses of premeditated murder.

" 'The trial court must instruct on . . . . necessarily included offenses when the evidence raises a question as to whether all the elements of the charged offense are present. . . . [¶] Nevertheless, "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ." [Citation.] Such instructions are required only where there is "substantial evidence" from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense.' [Citation.] 'Substantial evidence,' in this context, 'is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' " (*People v. Williams* (2015) 61 Cal.4th 1244, 1263.) " '[S]peculation is insufficient to require the giving of an instruction on a lesser included offense.' " (*Id.* at p. 1264.)

We agree with the trial court that there was insufficient evidence to support an instruction on the lesser included offenses of murder. Defendant argues the killing might have occurred in a manner that would have qualified either as first degree murder or as one of the lesser homicide offenses, but all such scenarios are based entirely on

speculation. The record contains very little information about the manner in which the shooting occurred. Both Cayetano and defendant claimed not to have seen the shooting. The forensic evidence suggested that Karriem fired one shot before his gun jammed, but whether he fired the first shot is unknown. Nor was there significant evidence about the identity of the shooter. The investigating officer ruled out Williams as the shooter on the basis of the pattern of his handprints on the vehicle in the garage, but the officer's reasoning was hardly conclusive, especially in view of defendant's statement that two men entered the garage with him. No other forensic evidence was found to identify a shooter. In light of this, defendant's admitted presence was insufficient to persuade a reasonable jury that he was the shooter. In these circumstances, there simply was no substantial evidence to support an instruction on either premeditated murder or its lesser included offenses.

There is a second, related reason for rejecting the instructions. As explained in *People v. Mendoza* (2000) 23 Cal.4th 896, it is inappropriate to instruct on lesser degrees of homicide when the evidence demonstrates a felony murder: "When the prosecution establishes that a defendant killed while committing one of the felonies section 189 lists, 'by operation of the statute the killing is deemed to be first degree murder as a matter of law.' [Citations.] Thus, there are no degrees of such murders; as a matter of law, a conviction for a killing committed during a robbery or burglary can *only* be a conviction for first degree murder. [¶] . . . Where the evidence points indisputably to a killing committed in the perpetration of one of the felonies section 189 lists, the *only* guilty verdict a jury may return is first degree murder. [Citations.] Under these circumstances, a trial court 'is justified in withdrawing' the question of degree 'from the jury' and instructing it that the defendant is either not guilty, or is guilty of first degree murder. [Citation.] The trial court also need not instruct the jury on offenses other than first degree felony murder or on the differences between the degrees of murder." (*Id.* at pp. 908–909.)

It is undisputed that Karriem's killing occurred in the course of a burglary. As a result, defendant was either guilty of felony murder, by virtue of his participation in the

13

burglary, or not guilty of murder at all. The only proper issue for the jury was therefore whether defendant committed burglary, which necessarily required a finding of guilt on the charge of first degree felony murder. The precise circumstances of the killing became irrelevant, and instructions on degrees of homicide reliant on those circumstances became unnecessary and inappropriate.

Defendant cites our decision in *People v. Anderson* (2006) 141 Cal.App.4th 430, in arguing he was entitled to instructions on the lesser included offenses of murder because premeditated murder was charged in the information. (See *id.* at p. 445.) Yet *Anderson* plainly recognizes it is not enough for premeditated murder to be charged to justify an instruction on lesser included offenses; the record must also contain substantial evidence to support those offenses. (*Id.* at p. 446.) Further, *Anderson* also recognizes the exclusive nature of the felony-murder charge. The decision found instruction on the lesser included offenses appropriate only because the crime was not indisputably a felony murder, given substantial evidence in the record that the homicide did not occur in the course of an enumerated felony but was, instead, a homicide of another type. (*Id.* at pp. 447–448.)

Unless defendant is charged with murder other than felony murder on remand or new evidence is presented suggesting the crime was not a felony murder, this ruling will stand as law of the case. (See *People v. Anderson* (2008) 169 Cal.App.4th 321, 331–332 (*Anderson II*).)

**B. *Admission of Defendant's Police Interview***

Defendant contends his statements to police should have been suppressed because the detectives failed to stop questioning him after he made an unequivocal request for an attorney. (*Edwards v. Arizona* (1981) 451 U.S. 477, 484–485.) He also contends various police tactics, combined with his own mental deficits, rendered his statements involuntary.

"In reviewing the trial court's denial of a suppression motion on *Miranda* and involuntariness grounds, ' " 'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We

14

independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' " ' [Citations.] Where, as was the case here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review." (*People v. Duff* (2014) 58 Cal.4th 527, 551.)

### 1. Defendant's Request for a Lawyer

The interview was conducted by two detectives. The first portion of the interview occurred in the San Mateo County jail, where defendant was being held on unrelated charges, but the two detectives later took defendant, with his consent, to a San Francisco police office to complete the interview.

Defendant was informed of his rights under *Miranda* prior to any questioning about the events at the White residence, and he agreed to talk to the detectives about the incident. Nearly two hours into the interview, after defendant insisted he did not know the names of the other two men, one of the detectives suggested they relocate to San Francisco, where defendant might be able to identify the two men from photographs. The following then occurred:

"[Defendant]: Yeah, yeah, when I tell you, that's what you, that's what you want to do, man.

"[Detective]: All right. Let's go do that [(go to San Francisco)].

"[Defendant]: We got to do that now?

"[Detective]: Yeah.

"[Defendant]: What if I want—

"[Detective]: Because you're doing the right thing right now and I want you to continue doing the right thing.

"[Defendant]: All right. What if I wanted to—I'm not saying that I don't trust you all . . . , but what about talking to like, you know what I mean, you know like I just— I know you're all the police . . . and I've talked to the police and I've been around crooked cops, bad cops, and I've seen a whole lot of stuff with the police. I'm not saying you guys are bad.

15

"[Detective]: No, no, we get it.

"[Detective]: I hear you.

"[Detective]: It's a general thing.

"[Defendant]: The police in general you know what I'm saying.

"[Detective]: We get it, we get it.

"[Defendant]: You know what I mean. I have a right to talk to an attorney, too.

"[Detectives (both at once)]: You do.

"[Defendant]: Yes. And I'm just saying I want to take advantage of that right, too.

"[Detective]: Would you like to talk to an attorney? You told me earlier—

"[Defendant]: And I'm not saying that we can—after I talk to the attorney they got to be sitting there, I talk to them and we can come back and have this same conversation again.

"[Detective]: Listen to what I'm saying.

"[Defendant]: Yeah.

"[Detective]: I read you your rights out there, and you told me you understood them.

"[Defendant]: Yeah.

"[Detective]: You told me you'd talk to me, okay. So has that changed now?

"[Defendant]: No.

"[Detective]: Okay.

"[Defendant]: 'Cause you read me my rights, so that's my rights.

"[Detective]: So what I'm asking you because you're saying an attorney, whatever, if you want an attorney you can have an attorney anytime but—you know, you ask for one then whatever, we're done talking, and you can have an attorney. You know, what I'd like, what I'm asking you to do now is come with us to our office and let me show you some pictures and you can point them out.

"[Defendant]: Yeah, that's no problem. We can do that, man.

"[Detective]: Okay.

16

"[Defendant]:  Okay.

"[Detective]:  And you're comfortable with that?

"[Defendant]:  Yeah, and we'll just continue to talk about this because I'm fearful man, you feel me, so—

"[Detective]:  Let me see if I can get you out of here . . . ."[5]

A few minutes later, before the group left for San Francisco, one of the detectives confirmed that defendant was not asking to speak to an attorney, saying, "You mentioned an attorney.  You're not asking for one now or anything, correct?"  Defendant responded, "No."

Defendant filed a motion to suppress his statement, arguing in part that the police failed to comply with *Miranda.*  The trial court denied the motion on this ground, concluding that while the detectives and defendant had "actually quite a nuanced conversation back and forth" about defendant's rights, defendant never said he wanted an attorney.

" ' "As a prophylactic safeguard to protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in *Miranda*, required law enforcement agencies to advise a suspect, before any custodial law enforcement questioning, that 'he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'  [Citations.]" '  [Citation.] [¶] ' " '[I]f the accused indicates in any manner that he wishes to remain silent or to consult an attorney, interrogation must cease, and any statement obtained from him during interrogation thereafter may not be admitted against him at his trial' [citation] . . . . 'Critically, however, a suspect can waive these rights.' " ' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1085–1086.)

---

[5] This account has been changed slightly from the transcriptions in the record to reflect more accurately the recorded conversation.

17

"Once a defendant has waived his or her right to counsel, . . . if that defendant has a change of heart and subsequently invokes the right to counsel during questioning, officers must cease interrogation unless the defendant's counsel is present or the defendant initiates further exchanges, communications, or conversations. [Citation.] For a statement to qualify as an invocation of the right to an attorney, however, the defendant 'must unambiguously request counsel. . . . [H]e must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.' [Citation.] '[A] reviewing court—like the trial court in the first instance—must ask whether, in light of the circumstances, a reasonable officer would have understood a defendant's reference to an attorney to be an unequivocal and unambiguous request for counsel, without regard to the defendant's subjective ability or capacity to articulate his or her desire for counsel . . . .' " (*People v. Cunningham* (2015) 61 Cal.4th 609, 645–646 (*Cunningham*).)

" 'In certain situations, words that would be plain if taken literally actually may be equivocal under an objective standard, in the sense that *in context* it would not be clear to the reasonable listener what the defendant intends. In those instances, the protective purpose of the *Miranda* rule is not impaired if the authorities are permitted to pose a limited number of followup questions to render more apparent the true intent of the defendant.' " (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 218.) " ' "[W]hen a suspect under interrogation makes an ambiguous statement that could be construed as an invocation of his or her *Miranda* rights, 'the interrogators may *clarify* the suspect's comprehension of, and desire to invoke or waive, the *Miranda* rights.' " ' " (*Id*. at p. 217.)

After carefully reviewing the transcript of defendant's interview and repeatedly listening to the recording, we agree that he was attempting to assert his right to consult an attorney when he told the detectives, "I want to take advantage of that right, too." The analysis, however, is by no means straightforward. In retrospect, defendant appears to have attempted to introduce the subject when he three times said, "What if I want—," "What if I wanted to—," and "what about talking to," each time without completing his

18

thought.  Because he did not complete his thought, however, the detectives had no reason to understand he wanted to raise the issue of counsel.  Defendant then began talking about potential police dishonesty, apparently attempting to justify his wish for an attorney before articulating it.  After a brief discussion of police misconduct, defendant mentioned the existence of his right to counsel.  The officers immediately agreed that he had such a right.  Only then did defendant articulate what appears to have been on his mind, but his statement, which seems clear on the page—"And I'm just saying I want to take advantage of that right, too"—does not sound on the recording like a declaration of current intent; rather, it appears to refer to an event occurring in the future, as though defendant is informing the detectives that he will, at some future time, want to "take advantage of that right" by consulting an attorney.  One of the detectives immediately asked defendant whether he would "like to talk to an attorney," attempting to clarify his meaning.  At that point, defendant, interrupting the detective, made a statement suggesting he had a present intent to consult an attorney, but his statement—"And I'm not saying that we can—after I talk to the attorney they got to be sitting there, I talk to them and we can come back and have this same conversation again"—was fractured and indirect.  Its apparent meaning, that defendant wanted to take a break, consult an attorney, and resume the interview afterward, is implicit and becomes clear only upon careful review.[6]  When the detective, intent on completing his attempt to clarify defendant's meaning, pushed ahead, defendant disclaimed any desire to consult an attorney, initially telling the detectives nothing had changed with respect to his willingness to speak with them and then, upon further questioning, telling them he would travel with them to San Francisco rather than take a break and consult an attorney.

---

[6] It is suggestive of the lack of clarity in defendant's comment that the trial court, upon listening to the recording, interpreted the first four words, "I'm not saying that," as responding to the officer's inquiry about an attorney.  While we do not have the same understanding, since there is no audible pause between those words and the following, "we can—," the different conclusions illustrate the lack of clarity in defendant's words.

While we conclude defendant was attempting to assert his right to consult an attorney when he said, "I want to take advantage of that right, too," the issue on appeal is not whether defendant's intent can be discerned by an appellate court after repeated listening and careful parsing. Rather, the issue is whether " 'a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.' " (*Cunningham, supra*, 61 Cal.4th at p. 646.) We conclude a reasonable officer would not have had that understanding. As noted above, defendant's most direct statement of his intent sounds, on the tape, as though it refers to a future event. It was not until the detective attempted to clarify defendant's meaning that defendant made a statement which suggests he wanted to speak to an attorney before continuing the interview. Yet that statement was phrased in a roundabout, disjointed manner, rather than as a straightforward declaration of intent. Under the give-and-take of the interview, we cannot say the detective should have recognized defendant's comment as a present request to consult counsel, and the detective's continued attempt to clarify defendant's meaning was, in the context of the interview, reasonable. As noted, defendant promptly abandoned the attempt to assert his right to counsel when questioned.

Defendant argues the detectives did not make a genuine attempt to clarify defendant's intent until they had talked him into traveling to San Francisco, but we do not agree. Immediately after defendant's reference to taking advantage of his right to an attorney, the detective asked defendant, "Would you like to talk to an attorney?" He then began to refer to defendant's earlier waiver, presumably in an effort to clarify the reason for his inquiry. Defendant interrupted the detective, apparently to answer his question, but the answer was not a straightforward "yes" or "no." Rather, as discussed above, his allusion to securing an attorney was made in a disjointed, ambiguous manner. The detective, in response, completed his attempted reference to defendant's earlier agreement to talk and asked, "[H]as that changed now?" In the context of the discussion, the detective's question was plainly a reference to his earlier question, whether defendant would "like to talk to an attorney." Defendant said nothing had changed. The detective then confirmed that if defendant wanted to talk to an attorney, he could do so at any time.

20

The exchange represented a good faith attempt by the detective to clarify defendant's intent. Defendant's retreat from his apparent wish to consult an attorney was not the result of browbeating or manipulation by the detectives.

### 2. Police Coercion

At the very outset of the interview, one of the two detectives told defendant he had spoken to the prosecutor in charge of defendant's San Mateo case and suggested he could get defendant released sooner if defendant could provide information. He then asked defendant about a killing unrelated to the present crime, one in which defendant was not suspected of involvement. Defendant told the detective he was aware of the killing but knew nothing beyond what he had read. After further discussion, during which defendant continued to claim ignorance of the killing, the detective reiterated that if defendant learned anything, "this offer would stand."[7]

At that point, the second detective said, "I've got a similar kind of case." Defendant responded, "It's two different cases you're all coming to talk to me about?" After reading defendant his *Miranda* rights and engaging in a few minutes of chit-chat, the second detective began questioning defendant about the killing at White's house. Following this, over the course of an extended interview, defendant provided the account described above.

In the course of the interview, defendant periodically expressed concern for his safety if he gave the detectives a complete account of the crime, given the possibility of retribution from the others involved. In response, the detectives told defendant he could be protected if he told them what he knew. Early in the interview, for example, one of the officers said, "You can get moved. If you're afraid like that and you're a witness and you're going to cooperate we can get you moved and it is that simple you know. . . . [¶] . . . [¶] . . . [I]f you know something kind of now is the time to tell us and you know we can . . . have our District Attorney's office deal with these guys and we can get you

---

[7] This initial portion of the interview was not played to the jury. We rely on a copy of the transcript from the preliminary hearing in describing it.

21

moved or do whatever needs to be done for protection." The officers occasionally referred to "moving [you] or some sort of protection" later in the interview, including a reference to a witness protection program.

When one of the detectives asked defendant whether he would accompany them to the San Francisco Police Department, defendant said he was looking forward to a cooking class later that day, at which he would receive better food than ordinarily provided by the jail. The detectives told defendant that if he went with them to San Francisco, he would be provided "within reason what you want because I am taking you away from your dinner."[8]

In a motion to suppress his statement, defendant argued his interview was the product of police coercion. At a hearing on the motion, a psychologist testified that defendant had a mild developmental disability and suffered from posttraumatic stress disorder (PTSD) and was therefore more susceptible than most to police coercion. After reviewing the tapes of the interview sessions, the trial court denied the motion to suppress. On the issue of voluntariness, the court concluded the evidence did not support a finding defendant was mentally limited. Based on evidence from his schooling, the court concluded, when defendant is not distracted "he is able to perform well." The court similarly found unsupported the psychologist's testimony that defendant had a language disorder. The court concluded the offer of a shortened sentence did not affect the voluntary nature of defendant's statement because it was offered in return for information on a different crime. The court also rejected claims that food was used as an inducement and found defendant showed no evidence of fatigue during the interview.

The law governing the voluntariness of statements to police was summarized in *People v. Linton* (2013) 56 Cal.4th 1146 at pages 1176–1177: " ' "A statement is involuntary if it is not the product of ' "a rational intellect and free will." ' [Citation.] The test for determining whether a confession is voluntary is whether the defendant's

_____

[8] As the detective said shortly after, in offering defendant his choice of dinner, "I'm not doing that to get you on my good side [*sic*], I'm doing it because I'm pulling you away from your dinner here."

22

'will was overborne at the time he confessed.' " ' [Citations.] [¶] ' "A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. [Citation.] Although coercive police activity is a necessary predicate to establish an involuntary confession, it 'does not itself compel a finding that a resulting confession is involuntary.' [Citation.] The statement and the inducement must be causally linked. [Citation.]" [Citation.]' [Citation.] A confession is not rendered involuntary by coercive police activity that is not the 'motivating cause' of the defendant's confession. [Citation.] [¶] 'The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made.' [Citation.] 'Whether a confession was voluntary depends upon the totality of the circumstances.' "

Defendant first contends his statement was involuntary because it was given in return for a promise of leniency with respect to the San Mateo County charges. There is little question defendant's statement would be involuntary if given in return for the promise of more lenient treatment. (E.g., *People v. Vasila* (1995) 38 Cal.App.4th 865, 874.) As the trial court found, however, the offer of leniency was given in return for information about the unrelated killing. When defendant said he had no knowledge of the crime, other than what he had read, the detective who had offered leniency told defendant the offer would remain open in the event he learned anything. At that point, a different detective made clear he wanted to talk to defendant about a different crime, and he gave defendant the *Miranda* warnings. Only then did discussion turn to the killing at White's residence.

A promise of leniency renders a statement involuntary only if the promise was "causally related" to the making of the statement. (See *People v. Tully* (2012) 54 Cal.4th 952, 985–986.) Because the detective's promise of leniency was made in return for information about a different crime, it did not motivate defendant's subsequent statements about the events at the White residence. There is no reason to suspect, and defendant does not argue, that he was confused about the nature of the offer of leniency. It was made by one detective expressly in return for information about a specific crime.

23

When defendant professed ignorance, the detective stopped questioning defendant and told him the offer would remain open in the event he learned anything. When questioning shifted to the second detective, defendant acknowledged the detective intended to discuss a different crime, and defendant was given *Miranda* warnings, suggesting a change in the nature of the questioning. The second detective did not make an offer of leniency, and neither defendant nor the detectives thereafter referred to the original offer. There is simply no reason to believe that defendant's subsequent statement about the events at White's residence was motivated by the offer of leniency.[9]

Nor did the detectives' discussion of witness protection motivate defendant's statement. The discussion of protection did not occur in connection with defendant's description of his own role in the break-in. Rather, the detectives suggested defendant could be protected if he provided information sufficient to identify the others involved in the crime. To the extent it can be argued defendant provided information in return for a promise of protection, the only information so provided would have related to the other participants.

In any event, the Supreme Court has held that a discussion of the availability of witness protection in return for truthful testimony, as opposed to a promise of admission to such a program, does not render a statement involuntary. (*People v. Tully, supra,* 54 Cal.4th at pp. 993–994.) Nothing more occurred here. The detectives did not promise to place defendant in a witness protection program in return for his testimony. Rather, they discussed witness protection as one of a series of protective actions that would be available if defendant's statements exposed him to a risk of retribution. (See *id.* at p. 994 ["the police did no more than permissibly point out a possible benefit that might accrue from his ' " 'truthful and honest course of conduct' " ' "].)

_____

[9] Defendant acknowledges the promise was made in connection with information on a different crime, but he argues it "served to introduce [defendant] to the basic premise that the inspectors were inclined to provide favors . . . ." Defendant cites no case law suggesting that a confession motivated by a defendant's belief that police might "provide favors" is thereby rendered involuntary.

24

Defendant also contends he was promised food for his statement, but that misstates the record. At most, the detectives promised defendant his choice of take-out food if he traveled with them to San Francisco to view photographs of possible participants in the crime. The promise therefore had no causal connection to his statement, but only to his agreement to relocate.

Finally, defendant contended he was more susceptible to coercion than most. As discussed above, we find no coercion for reasons unrelated to defendant's purportedly increased susceptibility. The issue of his relative susceptibility is therefore irrelevant. In any event, the trial court found defendant not to be unusually susceptible to coercion. We must accept this factual finding because it is supported by substantial evidence in the record. (E.g., *People v. McCurdy, supra*, 59 Cal.4th 1063, 1086 [on review of claim of coercion, appellate court must accept trial court findings if supported by substantial evidence].)

Unless additional evidence is presented on remand regarding the circumstances of defendant's police interview, these rulings regarding the admissibility of defendant's statements to police will stand as law of the case. (See *Anderson II*, *supra*, 169 Cal.App.4th at pp. 331–332.)

## C. *Other Issues*

### 1. Exclusion of Defense Expert Testimony

Defendant contends the trial court erred in prohibiting a defense expert from testifying regarding his susceptibility to duress.

Defendant offered the expert testimony of Dr. John Podboy, a clinical psychologist, regarding his mental deficits. In response to a prosecution motion in limine under sections 28 and 29, the trial court precluded Podboy from expressing an opinion regarding the effect of defendant's various deficits on his susceptibility to duress.[10] The

---

[10] As the court ruled, "He can testify to those symptoms he has identified. He can testify to PTSD. He can testify to [defendant's] IQ, and he can testify generally about what a person with the IQ he attributes to [defendant], what those attributes are, but he can't go beyond that and link it to the defense of duress or the defense of necessity."

25

court thereafter sustained objections to questions seeking Podboy's opinion whether defendant is "suggestible [*sic*] to duress" and "easily manipulated" as a result of his deficits.

"Under section 29, an expert may testify 'about a defendant's mental illness, mental disorder, or mental defect,' but 'shall not testify as to whether the defendant had or did not have the required mental states, . . . for the crimes charged.' Section 28, subdivision (a) precludes evidence showing diminished capacity, although it permits evidence of mental disease to be admitted 'solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 450.)

Notwithstanding these prohibitions, " '[S]ections 28 and 29 in fact leave an expert considerable latitude to express an opinion on the defendant's mental condition at the time of offense, within the confines, of course, of its twin prohibitions . . . .' " (*People v. Pearson, supra*, 56 Cal.4th at p. 451.) As explained in *People v. Cortes* (2011) 192 Cal.App.4th 873 (*Cortes*), "sections 28 and 29 do not prevent the defendant from presenting expert testimony about any psychiatric or psychological diagnosis or mental condition he may have, or how that diagnosis or condition affected him at the time of the offense, as long as the expert does not cross the line and state an opinion that the defendant did or did not have the intent, or malice aforethought, or any other legal mental state required for conviction of the specific intent crime with which he is charged." (*Id.* at p. 908.) We review the trial court's ruling under section 29 for abuse of discretion. (*People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1327.)

While acknowledging our deferential standard of review, we conclude the trial court erred in precluding Podboy's testimony regarding the effect of defendant's mental deficits on his ability to resist duress and manipulation. Contrary to the trial court's conclusion, neither view amounts to an opinion as to defendant's actual mental state at the time of the break-in. They simply describe for the jury the manner in which, in the expert's opinion, defendant's deficits affect his thinking process, relative to those of a

26

person lacking the deficits.  The questions precluded by the court permissibly sought to show "how [the deficits] affected [defendant] at the time of the offense."  (*Cortes, supra*, 192 Cal.App.4th at p. 908.)

Should similar expert testimony be introduced on remand, this ruling will stand as law of the case.  (See *Anderson II*, *supra*, 169 Cal.App.4th at pp. 331–332.)[11]

### III.  DISPOSITION

The judgment of the trial court is reversed, and the matter is remanded for further proceedings consistent with this decision.

_____
Margulies, Acting P.J.

We concur:

_____
Dondero, J.

_____
Banke, J.

---

[11] Defendant also challenged the trial court's admission of foundational testimony regarding the recording of defendant's telephone calls from jail.  While we need not resolve this issue, we note that it was inadvisable for the court to permit the introduction of such foundational testimony prior to ruling on the admissibility of the calls themselves, given the risk of unnecessary prejudice.